626 July 22, 2026 No. 691

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NICO ARMONN THOMAS,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR63675; A181854

Andrew M. Lavin, Judge.

Argued and submitted June 2, 2025.

Neil Francis Byl, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief was Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

In this criminal appeal, defendant challenges his conviction for unlawful use of a weapon with a firearm ("UUW-F"), ORS 166.220 and ORS 161.610(2), which the trial court reinstated on remand after our decision in *State v. Thomas*, 324 Or App 159, 525 P3d 73 (2023) (*Thomas I*). Defendant raises four assignments of error on appeal, in which he claims that the trial court erred by (1) denying his motion to dismiss based on former jeopardy, (2) denying his motion to exclude latent-fingerprint evidence, (3) denying his motion to exclude gang evidence, and (4) imposing an unconstitutionally disproportionate sentence. As explained below, we affirm.

## BACKGROUND

On an afternoon in September 2018, a shooting took place in a public intersection. Witnesses reported that two men got out of a Ford Windstar van and that one of the men fired two separate bursts of gunshots. Both men then returned to the van, with the shooter taking the driver's seat, and sped off. Police believed that C, a known gang member, was the intended victim, but he was uninjured and uncooperative. At the scene, police discovered 22 .45-caliber bullet casings on the ground.

Police monitored a nearby address associated with C on the suspicion that further violence could occur that evening. Less than two hours after the initial shooting, an officer saw a matching Ford Winstar van drive slowly by. An officer tried to stop the van, but it fled and led officers on a high-speed chase. During the chase, a .45-caliber Tanfoglio pistol was thrown out of the van's passenger window. The van eventually stopped, and two men, Edwards (the driver) and defendant (the passenger), fled on foot. They were caught and arrested. Inside the van, police found the box for a .45 caliber Glock handgun, with a 30-round extended magazine inside.

As part of investigating whether defendant was involved in the shooting, the police sent the Tanfoglio pistol and five bullet casings from the shooting scene to a forensics lab. The lab reported that defendant's fingerprints were

on the pistol but that none of the bullet casings were fired from the pistol. At that point, the prosecutor's office decided to charge defendant only with felon in possession of a firearm (FIP). Defendant was charged with FIP on January 10, 2019, and on May 30, 2019, he pleaded guilty to that charge and was sentenced. Meanwhile, on May 10, 2019, Edwards was indicted on charges related to the shooting, including attempted murder.

Months passed. In September 2019, a detective on the shooting investigation decided to take a second look at the 22 bullet casings found at the scene, because he had always found it surprising that the Tanfoglio pistol was not involved in the shooting. When he did so, the detective, who had recently received more training on forensic investigation of bullet casings, realized that the strike marks on the 22 casings were not all from the same brand of gun—14 of them appeared to be fired from a Glock and eight of them from a different brand of firearm. He decided to submit the non-Glock casings for forensic testing, and, this time, the lab reported that the casings were indeed fired from the Tanfoglio pistol.

Upon obtaining that evidence, the prosecutor's office sought and secured an indictment charging defendant with attempted second-degree murder with a firearm, attempted first-degree assault with a firearm, UUW-F, and FIP with a firearm (FIP-F).

Defendant moved to dismiss the new charges on former-jeopardy grounds under ORS 131.515(2), arguing that they arose from the same criminal episode as the previously charged FIP offense and that all of the offenses were reasonably known to the prosecutor at the time of the earlier FIP prosecution. The trial court agreed that the FIP-F charge was barred by former jeopardy—reasoning that, under the state's theory, defendant continually possessed the Tanfoglio pistol from the time of the shooting until he threw it out the van window two hours later—but concluded that the other charges arose from a separate criminal episode and therefore were not barred by former jeopardy. *Thomas I*, 324 Or App at 166.

The case proceeded toward trial, with defendant waiving his right to a jury and opting for a trial to the court. Before trial, as relevant to this appeal, defendant made two unsuccessful motions *in limine*, seeking to exclude (1) scientific evidence offered to establish that defendant's fingerprints were found on the Tanfoglio pistol, which defendant argued was insufficiently reliable for admission as scientific evidence under OEC 702, and (2) evidence relating to defendant's gang affiliation, which defendant argued was inadmissible propensity evidence under OEC 404 and OEC 403.

At trial, after hearing all the evidence, the court found defendant guilty of UUW-F and acquitted him on the other charges. The court sentenced defendant to 10 years in prison on the UUW-F conviction, pursuant to ORS 161.610 (4)(b), which provides a mandatory minimum sentence for certain repeat firearm offenses.

Defendant appealed, and, in *Thomas I*, we held that the trial court's ruling on defendant's motion to dismiss based on former jeopardy was legally flawed, in that the record established that "defendant's conduct underlying the UUW[-F] offense and FIP offense was continuous and uninterrupted and directed at a single criminal objective of threatening or harming [C]." 324 Or App at 166. Because the two offenses were part of the same criminal episode, it was necessary to determine whether the UUW-F offense was "reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution," an issue the trial court had not reached. *Id*. We vacated and remanded for the trial court to address that issue. *Id*. We did not reach defendant's other assignments of error but made clear that he could raise them again in a later appeal if the trial court reinstated the UUW-F conviction on remand. *Id*. at 161 n 1.

On remand, the trial court took additional evidence regarding what the prosecutor knew at the time of the first prosecution, which it considered along with the evidence previously received. The court ultimately denied the motion to dismiss, concluding that former jeopardy did not apply, and reinstated the UUW-F conviction.

Defendant appeals. In his first assignment of error, defendant challenges the trial court's ruling on remand denying his motion to dismiss the UUW-F charge on former-jeopardy grounds. His second, third, and fourth assignments of error raise the same issues raised but not reached in his first appeal. We address each assignment of error in turn, beginning with former jeopardy.

## FORMER JEOPARDY

ORS 131.515(2) prohibits the state from bringing separate prosecutions for charges arising from the same criminal episode if the charges were "reasonably known" to the prosecutor at the time of the first prosecution and venue lies in a single court:

> "No person shall be separately prosecuted for two or more offenses based upon the same criminal episode, if the several offenses are reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution and establish proper venue in a single court."

To obtain dismissal of criminal charges under ORS 131.515(2), the defendant must prove that all three statutory requirements for former jeopardy are met, *i.e.*, same criminal episode, reasonably known to the prosecutor, and single venue. *State v. Lyons*, 161 Or App 355, 360, 985 P2d 204 (1999). In this case, it is undisputed that the venue requirement is met, and *Thomas I* conclusively establishes that the same-criminal-episode requirement is met. Only the reasonably-known requirement remains at issue.

Whether a criminal charge was "reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution" does not turn on the collective knowledge of state actors generally but, instead, on the knowledge of the prosecutor. *State v. Hamel-Spencer*, 264 Or App 600, 610, 333 P3d 1157 (2014) (holding that the defendant failed to prove that the "appropriate prosecutor" knew of an offense, where there was evidence that an out-of-county prosecutor and out-of-county sheriff's deputies knew facts sufficient to prosecute, but no evidence that the local prosecutor shared that knowledge at the relevant point in time). The defendant must prove that the prosecutor "knew or should have

known" of "facts sufficient to indict or prosecute" the crimes at issue.[1] *State v. Lowery*, 95 Or App 583, 586-87, 770 P2d 923 (1989). It is not enough to prove that the prosecutor suspected other crimes. *State ex rel Juv. Dept. v. Nelson*, 124 Or App 562, 566, 863 P2d 497 (1993), *rev den*, 319 Or 81 (1994) ("[A] prosecutor's 'suspicion' that other wrongful acts may have been perpetrated is not sufficient to invoke the former jeopardy rule."). Also, in assessing the facts known to the prosecutor, it is necessary to consider "the prosecutor's degree of certainty about the existence of those facts." *Lyons*, 161 Or App at 365.

The parties' initial point of disagreement relates to the legal standard to obtain an indictment, as relevant to assessing whether the prosecutor in this case knew "facts sufficient to indict or prosecute" the UUW-F charge at the time the FIP prosecution was commenced. *Lowery*, 95 Or App at 587. In short, defendant contends that facts are sufficient to indict when they establish probable cause, whereas the state maintains that facts are sufficient to indict only if they are legally sufficient to prove the crime beyond a reasonable doubt. The state relies on ORS 132.390, which provides, "The grand jury may find an indictment when all the evidence before it, taken together, is such as in its judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury." That statutory provision has existed in materially identical form since at least 1864. *See* The Codes and General Laws of Oregon, Crim Code, title I, ch VI, § 1249 (Hill 1887). Defendant relies on Article VII (Amended), section 5, of the Oregon Constitution—adopted in its current and most relevant form in 1974—or, more specifically, case law regarding it. *See* Or Const, Art VII (Amended), § 5(3) - (5) (providing that felony charges must to be brought by grand jury indictment, except that the district attorney may charge a person on an information if the person appears in court and knowingly waives indictment or "if, after a preliminary hearing before a magistrate, the

---

[1] The "should have known" aspect of the standard reflects the principle that the "prosecutor must [have made] a good faith effort to uncover the full extent" of the criminality involved in the criminal episode. *State ex rel Juv. Dept. v. Nelson*, 124 Or App 562, 567, 863 P2d 497 (1993), *rev den*, 319 Or 81 (1994). In this case, defendant does not contend that the prosecutor failed to make a good faith effort.

person has been held to answer upon a showing of probable cause that a crime punishable as a felony has been committed and that the person has committed it, or if the person knowingly waives preliminary hearing").

The trial court agreed with the state that a district attorney must be able to put forward a *prima facie* case to obtain an indictment. It understood the standard to be functionally equivalent to what is required to survive a motion for judgment of acquittal—legally sufficient evidence to allow a reasonable factfinder, viewing the evidence in the light most favorable to the state, to find the defendant guilty beyond a reasonable doubt. *See State v. King*, 307 Or 332, 339, 768 P2d 391 (1989) ("In ruling on the sufficiency of the evidence in a criminal case, the relevant question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

We agree with that view. We acknowledge that, in what appears to be *dicta*, the Oregon Supreme Court has occasionally described Article VII (Amended), section 5, as allowing a grand jury to return an indictment based on probable cause. *See State v. Keys*, 368 Or 171, 176, 489 P3d 83 (2021) (describing section 5 as "requir[ing] a check on the district attorney's charging authority[,]" which "can be in the form of the grand jury's determination of probable cause, a magistrate's determination of probable cause, or the determination by the person charged, reflected in the person's waiver, that a grand jury or a magistrate's determination of probable cause is an unnecessary procedural step"); *State v. Reinke*, 354 Or 98, 109, 121, 309 P3d 1059, *adh'd to as modified on recons*, 354 Or 570, 316 P3d 286 (2013) (discussing Article VII (Amended), section 5, in terms of "probable cause"); *see also State v. Davis*, 345 Or 551, 577, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009) (explaining that prosecutors are not obligated to "seek an indictment as soon as probable cause exists"); *State v. Guse*, 237 Or 479, 481-82, 392 P2d 257 (1964) ("It is presumed that an indictment was duly returned upon sufficient evidence to give the grand jury probable cause to believe that a crime had been committed by the accused.").

However, the only actual reference to probable cause in Article VII (Amended), section 5, appears in subsection (5), which pertains to informations, not indictments. *See* Or Const, Art VII (Amended), § 5(5) ("The district attorney may charge a person on an information filed in circuit court if, after a preliminary hearing before a magistrate, the person has been held to answer upon a showing of probable cause that a crime punishable as a felony has been committed and that the person has committed it, or if the person knowingly waives preliminary hearing."). More importantly, even if Article VII (Amended), section 5, sets a probable-cause floor for grand jury indictment, the fact remains that ORS 132.390 sets a higher bar. Defendant argues that ORS 132.390 should be read as permissive—allowing indictment if the standard stated therein is met, without actually requiring that standard to be met—but we are unpersuaded, particularly given that the substance of ORS 132.390 has been law in Oregon since at least 1864, whereas the relevant portion of Article VII (Amended), section 5, has existed only since 1974.

We therefore proceed with the understanding that, as relevant to former jeopardy under ORS 132.390, if the prosecutor knew facts that were legally sufficient to prove UUW-F beyond a reasonable doubt at the time of the commencement of the FIP prosecution, then the prosecutor knew facts "sufficient to indict or prosecute" defendant for the UUW-F offense within the meaning of ORS 132.390.

We describe what the prosecutor knew at the time of commencement of the earlier FIP prosecution in accordance with the standard of review. That is, we rely on the trial court's express and implied findings of fact and apply the law to those facts. *State v. Potter*, 236 Or App 74, 82, 234 P3d 1073 (2010).

First, based on eyewitness accounts, the prosecutor knew that two men arrived at the shooting scene in a black vehicle, that the driver was definitely involved in the shooting, and that it was possible but uncertain whether the passenger was involved in the shooting. One witness, an automotive mechanic, identified the shooter's vehicle as a black Ford Winstar van, and another described it as a black

SUV. Most witnesses reported a single shooter standing in the middle of the street and recalled hearing two bursts of gunshots—three to five shots, a pause, then approximately 15 more shots—but at least one witness allowed for the possibility of two shooters. The 30-round magazine found in the Glock box in the van would have allowed all the shots to be fired from one gun. Multiple witnesses agreed that the shooter got into the driver's seat after the shooting and drove away.

Second, the prosecutor knew that both the driver and the passenger were Black men. The shooter had been described by one or more witnesses as a tall skinny Black man with short-buzzed hair wearing a dark-colored hoodie, and the other man had been described as a shorter stocky Black man wearing a green shirt. The prosecutor viewed those descriptions as vague and at least somewhat less reliable due to the witnesses being of a different race. Both Edwards and defendant are Black men and were wearing hoodies when apprehended (maroon and blue, respectively). None of the eyewitnesses were able to positively identify Edwards or defendant as the shooter.

Third, the prosecutor knew that a Tanfoglio pistol was thrown out the passenger window of Edwards' van during the high-speed chase that occurred a couple hours after the shooting and that defendant's fingerprints were found on that pistol. The first five bullet casings from the shooting that were forensically tested did not match that pistol, however, so there was nothing to connect that gun to the shooting. The prosecutor decided to charge defendant with FIP based on his having handled the Tanfoglio pistol, but he did not feel that he had enough to charge him for the shooting.

On the latter point, the prosecutor was particularly concerned about the two-hour gap between the shooting and the police encounter, during which Edwards could have dropped off the person who was with him at the time of the shooting and picked up defendant. He was also concerned about the lack of any positive identification of defendant. And he was concerned about the lack of forensic evidence tying defendant to a gun used in the shooting, which left

the prosecutor himself unsure as to whether defendant was involved in it. The fact that defendant was a felon could explain his fleeing the police, regardless of whether he was involved in the shooting. It was only later, when additional bullet casings from the shooting scene were tested and came back as a match for the Tanfoglio pistol that the prosecutor felt he had enough to charge defendant for the shooting.[2]

Based on those facts, as explicitly and implicitly found by the trial court, the trial court did not err in concluding that the facts known to the prosecutor when the FIP prosecution commenced were legally insufficient to prove that defendant had participated in the shooting and committed UUW-F. The witnesses largely agreed that there was a single shooter, which was consistent with the 30-round magazine found in the van, and that the shooter got into the driver's seat after the shooting. The police saw defendant in the passenger seat of the van, not the driver's seat, and that was nearly two hours after the shooting. No one was able to positively identify defendant as a shooter. The Tanfoglio pistol thrown out the window during the police chase was tied to defendant by fingerprint evidence, but, when the FIP prosecution commenced, it had not yet been tied to the bullet casings found at the shooting scene, as the first five casings tested came from a different gun. Under the circumstances, the prosecutor did not know enough to obtain an indictment for UUW-F, and the trial court therefore did not err in denying defendant's motion to dismiss under ORS 131.515(2).

## LATENT-FINGERPRINT EVIDENCE

Defendant next challenges the denial of his motion *in limine* to exclude evidence of the latent-fingerprint analysis done on the Tanfoglio pistol thrown from the van's window. He sought exclusion of that evidence under OEC 702, 401, and 403. On appeal, he makes arguments similar to those that prevailed in *State v. Adams*, 340 Or App

---

[2] By contrast, the prosecutor felt that he had obtained enough evidence to charge Edwards for the shooting at an earlier point in time. Edwards was driving the van when the police found him, which supported an accomplice theory at the least. Moreover, while the police were investigating the intersection shooting, Edwards was involved in another incident in which he and C exchanged gunfire in broad daylight in a department store parking lot, which provided particularly strong motive evidence for Edwards.

661, 667, 572 P3d 291, *rev allowed*, 374 Or 419 (2025), in which we held that it was error to admit evidence matching a particular spent bullet to a particular gun, where the state failed to establish the scientific validity of the forensic method used.

We need not decide whether the trial court erred in admitting the latent-fingerprint evidence in this case, because, even if it did, the putative error was harmless and thus not a basis for reversal. *See State v. Ramirez*, 310 Or App 62, 63, 483 P3d 1232 (2021) ("Evidentiary error is not presumed to be harmful, and we will affirm a defendant's conviction if 'there [is] little likelihood that the particular error affected the verdict[.]'" (Quoting *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (brackets in *Ramirez*).)). Defendant was charged with UUW-F based on the shooting incident involving Edwards and C. The disputed issue at trial was whether defendant participated in that shooting. Two hours after the shooting, defendant was in the passenger seat of the van when the Tanfoglio pistol was thrown out the passenger window, which is how the police obtained the pistol, and defendant pleaded guilty to FIP based on his possessing the pistol at least at that time. Under the circumstances, forensic evidence that defendant's fingerprints were found on the pistol further confirmed that he had handled it, but that was already established. The fingerprint evidence did not provide any new information as to whether defendant was present for the shooting two hours earlier or participated in the shooting. On this record, any error in admitting the latent-fingerprint evidence was harmless.

## GANG EVIDENCE

Defendant next challenges the denial of his motion *in limine* to exclude gang-related evidence. The trial court summarized the evidence at issue as falling into four categories: (1) specific evidence connecting defendant and Edwards to one gang; (2) specific evidence connecting C to another gang; (3) expert testimony about the nature of those two gangs; and (4) evidence of the history of conflict between those two gangs. Defendant argued that the evidence should be excluded as improper propensity evidence, asserting, for example, that "the State's saying that just because someone's

affiliated with a gang that, therefore, they're going to go out and do all these types of bad behaviors when, in fact, that's not the case." The state countered that it was seeking to use the evidence only for nonpropensity purposes, specifically to show defendant's motive or intent.

The trial court denied the motion, ruling that the evidence was admissible under both OEC 404 and OEC 403. The court reasoned that the state was offering the evidence for relevant nonpropensity purposes and that its probative value was high, as it provided an explanation for a public daytime shooting involving otherwise unrelated people. As for the risk of unfair prejudice, the court recognized that misuse of the evidence as propensity or character evidence could be unfairly prejudicial, but it assured defendant that it would not misuse the evidence in that way. (Defendant had already waived his right to a jury, so the matter was to be tried to the court.) The court gave itself the "equivalent of a limiting instruction" not to infer that, because defendant was associated with a gang, he was "more capable or likely to commit" the charged crimes.

Defendant challenges the denial of his motion. He acknowledges that the evidence was admissible under OEC 404(4) but contends that it should have been excluded under OEC 403. *See* OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.").[3] He argues that the trial court wrongly viewed the evidence as nonpropensity evidence, which necessarily skewed its OEC 403 balancing. He asks that we remand for the trial court to

---

[3] OEC 404(4) allows the admission of relevant evidence of other crimes, wrongs, or acts by the defendant in a criminal action, subject to certain limitations, including constitutional limitations. By contrast, OEC 404(3), which applies in all other situations, prohibits the admission of evidence of other crimes, wrongs, or acts to prove a person's character and action in conformity therewith, while allowing the admission of such evidence for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Although OEC 404(3) does not apply directly to the defendant in a criminal action, the Supreme Court has explained that courts should still consider whether other-acts evidence would be admissible under OEC 404(3), as relevant to the balancing required by OEC 403. *State v. Davis*, 372 Or 618, 635, 553 P3d 1017 (2024).

redo its OEC 403 balancing with a correct understanding of the evidence. The state defends the court's OEC 403 ruling.

With the benefit of the Oregon Supreme Court's recent decision in *State v. Herring*, 375 Or 350, ___ P3d ___ (2026), we readily conclude that the trial court did not err. The state in that case sought to show the defendant's motive for engaging in a daytime public shooting with evidence of "gang membership, gang culture, and [a] violent gang rivalry." *Id.* at 353. The Supreme Court held that the evidence was properly admitted, as its relevance did not depend on propensity reasoning:

> "The state offered the evidence of defendant's gang membership in the *** Bloods, and that gang's rivalry with the *** Crips, to explain defendant's hostility toward Crips, which included [the victim]. Defendant's gang membership provided defendant with a reason for hostility that would not exist without that membership. According to the state's theory and evidence, the interests of the two gangs conflict, so a longtime, senior member of the *** Bloods, such as defendant, by virtue of that status, has a reason to be hostile toward Crips. That chain of reasoning does not require one to draw any broad inferences about defendant's 'criminal tendencies and lifestyle,' nor any inference that defendant, because of his mere membership in the gang, has a *general disposition* toward violence. It requires only an inference that, by virtue of his status within a group that has interests opposed to another group, this defendant has a reason to be hostile toward members of the other group. Here, one may logically draw that inference without any inquiry into defendant's general character traits."

*Id.* at 370 (emphasis in original); *see also State v. Travis*, 344 Or App 496, 503, 580 P3d 889, *rev allowed*, 375 Or 109 (2025) (noting that "other-acts evidence that is offered for a nonpropensity purpose and does not rely on propensity reasoning generally will be admissible").

The situation is the same here. As in *Herring*, the evidence that defendant sought to exclude was relevant to defendant's motive for the shooting, through a logical chain that did not require propensity reasoning. Moreover, the trial court recognized the risk of misuse of the evidence and addressed it with a self-instruction, thus ensuring that the

evidence would be considered only as relevant to motive and intent. The court did not err in its OEC 403 balancing.

## 10-YEAR PRISON SENTENCE

Defendant's final assignment of error is directed to his 10-year prison sentence, which he claims is unconstitutionally disproportionate.

ORS 161.610(4)(b) mandates a minimum sentence of 10 years in prison for "felonies having as an element the defendant's use or threatened use of a firearm in the commission of the crime," if the defendant has a prior conviction for such a felony. It is undisputed that UUW-F is a qualifying felony and that defendant has at least one prior conviction involving the use of a firearm, specifically a prior UUW-F conviction. Defendant argues, however, that the 10-year minimum sentence is disproportionate as applied to him, in violation of Article I, section 16, of the Oregon Constitution. *See* Or Const, Art I, § 16 ("Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense.").

We review for legal error. *State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009). In addressing a disproportionality challenge under Article I, section 16, we may not "second-guess the legislature's determination of the penalty or range of penalties for a crime" except in the "rare circumstance" where the punishment in a particular case "'shock[s] the moral sense' of reasonable people." *Id.* at 58. Three factors are relevant to that determination: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." *Id.* (footnote omitted). Where, as here, a defendant makes an as-applied challenge to a sentence imposed under a repeat-offender statute, "the first and third factors identified in *Rodriguez/Buck*, in large part, coalesce." *State v. Althouse*, 359 Or 668, 686, 375 P3d 475 (2016). Thus, we compare the severity of the penalty against not only the gravity of the current offenses but also "the gravity of [the defendant's] criminal history," including "the specific circumstances" of the offense. *Id.*

Here, in rendering its verdict, the trial court seemingly found that defendant had shot at C with the intention of scaring him, not killing or injuring him. Nonetheless, defendant and Edwards fired at least 22 rounds in C's direction in the middle of a workday near an intersection that was "pretty active with lots of stuff all the time," at least one bullet entered a nearby home, and multiple bullets entered a nearby business. Eight bullets were matched to defendant's gun. We disagree with defendant's characterization of his conduct as "on the outer edge" of what is punishable as UUW-F. Further, defendant's prior UUW-F conviction arose from an incident in which he shot into an occupied vehicle. Thus, both the current incident and the prior incident involved defendant using a firearm in a particularly dangerous way that created a significant risk of death or serious physical injury to others. The statutory minimum 10-year prison sentence is not constitutionally disproportionate as applied to defendant.[4]

Affirmed.

---

[4] To the extent that defendant argues that, under the second *Rodriguez/ Buck* factor, his crimes are less serious than other crimes with shorter sentences, we note that sentences for repeat offenders are not well suited for comparison to sentences for individual offenses. *See Althouse*, 359 Or at 685-86 ("the various combinations of convictions that can give rise to an enhanced sentence can diminish the extent to which a comparison of the penalty for a single related offense will shed light on the proportionality analysis"); *State v. Wheeler*, 343 Or 652, 678, 175 P3d 438 (2007) (rejecting an argument that "ignores the fact that ORS 137.719(1) is a recidivism statute that applies to [the] defendant only because he has two prior felony convictions").